WAVERLY D. CRENSHAW, JR., CHIEF UNITED STATES DISTRICT JUDGE
Security National Insurance Company ("Security National") brings this diversity action under the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaration regarding its obligation to defend or indemnify Jamestown Union Bancshares, Inc. ("Jamestown") and Union Bank (together, "Defendants") in a tort dispute *849 pending in Tennessee state court. Before the Court is Defendants' Motion to Dismiss (Doc. No. 12) on the ground that the Court should decline to exercise its discretion to adjudicate this dispute in deference to the state court forum. Defendants have responded in opposition. (Doc. No. 18.) For the following reasons, the motion will be denied.
I. Background
A. The Parties and the Insurance Policy
Security National is an insurance company incorporated in Ohio and based in Texas. (Doc. No. 1 at ¶ 1.) Jamestown and Union Bank are a Tennessee corporation and bank, respectively, with the same principal place of business in Jamestown, Tennessee. (Id. at ¶ 2.) On May 20, 2015, Security National issued Policy No. SDO111557-01 (the "Security Policy"), a Directors and Officers liability insurance policy, to Defendants. (Id. at ¶ 7.) The Security Policy ran through May 20, 2018. (Id.)
Insuring Agreement D of the Policy is subject to a $1,000,000 limit of liability and a $25,000 retention. (Id. at ¶ 8.) It states: "The Insurer will pay on behalf of the company, loss that is the result of a claim for a lending wrongful act first made during the policy period or during the Extended Reporting Period, if exercised." (Id.) "Lending Wrongful Act" (as amended by the Broad Form Lender Liability Endorsement) is defined as "any actual or alleged, misstatement, misleading statement, error or omission, or neglect or breach of duty by the company concerning an extension of credit by the company, or an actual or alleged agreement, failure or refusal by the company to extend credit. Lending wrongful act includes the servicing of loans for others under a contract or agreement." (Id. at ¶ 9.)
Insuring Agreement E is subject to a $2,000,000 limit of liability and a $25,000 retention. (Id. at ¶ 10.) It states: "The Insurer will pay on behalf of the company, loss that is a result of a claim for a company wrongful act first made during the policy period or during the Extended Reporting Period, if exercised." (Id.) "Company Wrongful Act" is defined as "any actual or alleged, misstatement, misleading statement, error or omission, or neglect or breach of duty by the company." (Id. at ¶ 11.)
As amended by the Broad Form Lender Liability Endorsement and the Delete Insider Loan Exclusion Endorsement, Exclusion C of the Security Policy states:
The Insurer shall not be liable to make any payment for loss in connection with any claim for a lending wrongful act based upon, arising out of, relating to, in consequence of, or in any way involving:
1. intentional noncompliance with a statute or regulation;
2. failure to effect or maintain any insurance or bond;
3. bankruptcy of, or suspension of payment by any bank, banking firm, broker or dealer in securities or commodities or any other financial institution;
4. any extension of credit which was, or which would have been at the time of its making, in excess of the legal lending limit of the company or any related entity which extended the credit; or
5. any lending or financial advisory service where such services are provided for a fee and are not part of the normal process of extending credit to the borrower.
(Id. at ¶ 12.)
There are other exclusions as well. Exclusion A.3 excludes coverage for "any insured *850 person or the company gaining, in fact, any profit, remuneration, or financial advantage to which they were not legally entitled." (Id. at ¶ 13.) Exclusion A.7 excludes coverage for:
[A]ny fraudulent, dishonest or criminal actions of an insured person or the company. However, the insured person or the company shall be indemnified for defense expenses as to any claim alleging such fraudulent, dishonest or criminal actions, unless a judgment or final adjudication establishes such fraudulent, dishonest or criminal acts or if such acts are otherwise established in fact. In the event that the Insurer has no liability, the insured person or the company agrees to repay to the Insurer, upon demand, all monies advanced by the Insurer in connection with such claim.
(Id. at ¶ 14.) Exclusion A.8 excludes coverage for:
[T]he willful failure to comply with any law or any governmental or administrative order or regulation by the company or an insured person or with the consent of the company or an insured person. For the purposes of this exclusion, "willful" means acting with reckless disregard of such laws, orders or regulations. However, the insured person or the company shall be indemnified for defense expenses as to any claim alleging such willful failure unless a judgment or final adjudication establishes such willful failure or if such willful failure is otherwise established in fact. In the event that the Insurer has no liability, the insured person and the company agree to repay to the Insurer, upon demand, all monies advanced by the Insurer in connection with such claim.
(Id. at ¶ 15.) Finally, Exclusion A.13 excludes coverage for "the assumption of any liability to defend, indemnify or hold harmless any person or entity, other than an insured person, under any written contract or agreement unless such liability would have been imposed in the absence of such contract or agreement." (Id. at ¶ 16.)
B. The Underlying State Tort Lawsuit
In November 2017, Lester and Ruth Clark (the "Clarks") filed a lawsuit against Union Bank in Overton County Circuit Court (the "Clark Lawsuit"). (Id. at ¶ 20.) The Clark Lawsuit alleges that Union Bank failed to acquire or maintain insurance on certain real property owned by Danielle Akard ("Akard"). More specifically, the Clarks alleged that they (1) sold the property at issue to Akard and retained a first priority lien as security for seller financing they provided to Akard; (2) Union Bank provided a loan to Akard and secured it with a second priority lien on the property; and (3) Union Bank agreed to provide insurance on the property for protection of the Clarks' and its' respective interests; and (4) Union Bank failed to obtain that insurance. (Id. at ¶¶ 22-25.)
It is not necessary for the Court to delve too deeply into the relationship between the Clarks and Akard here, nor to discuss at too great length the disputed events surrounding the alleged lack of property insurance. In short, at some point, Akard defaulted on her loan to Union Bank, and the bank moved to foreclose. The Clarks then allegedly learned that the bank had failed to maintain property insurance, a matter of apparent great concern given the Clarks' alleged concern about Akard's potential "vindictive" behavior. (Doc. No. 1-3 at 2.) Union Bank sought to secure insurance, but allegedly erroneously did not list the Clarks as insureds. After all this, in December 2016, the subject property burned to the ground under allegedly "mysterious circumstances." (Id.) The Clarks have been unable to obtain property insurance reimbursement. (See Doc. No. 1-3.)
*851 C. The Underlying State Tort Lawsuit and Instant Insurance Coverage Dispute
The Clark Lawsuit asserts causes of action for promissory estoppel, breach of contract, misrepresentation, negligence, subrogration/constructive trust, and other violations of Tennessee statutes. (Doc. No. 1-2.) On March 9, 2018, Security National denied coverage to Defendants under the Security Policy for the Clark Lawsuit on the grounds of, among other things, Exclusion C. Security National specifically asserted that: (1) the Clark Lawsuit alleged that Union Bank "was negligent regarding insurance on the property"; (2) "the entirety of the Complaint concern[ed] a loan made by Union Bank, foreclosure proceedings on its collateral, and insurance proceeds it may have received when its collateral was damaged"; (3) under the Security Policy, a Lending Wrongful Act includes misconduct "concern[ing]" a loan made by Union Bank; (4) Lending Wrongful Acts are covered under Insuring Agreement D of the Security Policy; (5) certain Lending Wrongful Acts are excluded under Exclusion C of the Security Policy, including claims arising out of "failure to effect or maintain any insurance or bond"; and (6) the Clark Lawsuit unquestionably involves the failure to effect or maintain insurance. (Doc. No. 1-3 at 3-4.) Accordingly, because Security National concluded that the entirety of the Clarks' complaint sought damages related to the alleged failure to maintain insurance, it declined any duty to indemnify Union Bank.[1] (Id. at 4.) Five months later, Security National filed this declaratory judgment action.
II. Legal Standard
The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) ; see also Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942). The Supreme Court has "repeatedly characterized the Declaratory Judgment Act as an enabling Act, which confers discretion on the courts rather than an absolute right upon the litigant." Wilton, 515 U.S. at 287, 115 S.Ct. 2137 (internal citations omitted). The court has further explained that the broad discretion given to district courts includes an alternative to dismissal; accordingly, district courts may also enter a stay of the federal action, pending resolution of the state court proceeding. Brillhart, 316 U.S. at 495, 62 S.Ct. 1173 ; Wilton, 515 U.S. at 282-83, 115 S.Ct. 2137 (discussing Brillhart and the appropriate inquiry for whether or not to enter a stay or to dismiss a declaratory judgment at the outset). Accordingly, the Court has broad discretion with respect to whether to exercise jurisdiction over Security National's action or to otherwise stay the action during the pendency of the underlying Clark Lawsuit. Cincinatti Ins. Co. v. Orten, Case No. 3:17-cv-00036, 2017 WL 4918594, at *3 (M.D. Tenn. Oct. 30, 2017).
The Court of Appeals for the Sixth Circuit has established guidelines for district courts deciding whether to exercise *852 discretionary jurisdiction over a declaratory relief action. "In determining the propriety of entertaining a declaratory judgment action, competing state and federal interests weigh in the balance, with courts particularly reluctant to entertain federal declaratory judgment actions premised on diversity jurisdiction in the face of a previously-filed state-court action." Adrian Energy Assocs. v. Mich. Public Serv. Comm'n, 481 F.3d 414, 421 (6th Cir. 2007). In insurance cases (like this one), the Court of Appeals has sometimes held that "declaratory judgment actions seeking an advance opinion on indemnity issues are seldom helpful in resolving an ongoing action in another court." Manley, Bennett, McDonald & Co. v. St. Paul Fire & Marine Ins. Co., 791 F.2d 460, 463 (6th Cir. 1986) ; see also Travelers Indem. Co. v. Bowling Green Prof. Assocs., PLC, 495 F.3d 266, 273 (6th Cir. 2007). The Court of Appeals has further "question[ed] the need for declaratory judgments in federal courts when the question is one of state law and when there is no suggestion that the state court is not in a position to define its own law in a fair and impartial manner." Bituminous Cas. Corp. v. J & L Lumber Co., Inc., 373 F.3d 807, 816-17 (6th Cir. 2004). Accordingly, generally, "[s]uch actions ... should normally be filed, if at all, in the court that has jurisdiction which gives rise to the indemnity problem. Otherwise confusing problems of scheduling, orderly presentation of fact issues and res judicata are created." Manley, 791 F.2d at 463 ; see also Scottsdale Ins. Co. v. Roumph, 211 F.3d 964, 967 (6th Cir. 2000) (hereinafter " Roumph"). However, there is no per se rule to prevent district courts from exercising jurisdiction over declaratory judgment actions related to insurance relationships and relevant exceptions to coverage. Roumph, 211 F.3d at 967 ; Allstate Ins. Co. v. Green, 825 F.2d 1061, 1066 (6th Cir. 1987), abrogated on other grounds by Roumph, 211 F.3d at 967.
Accordingly, courts routinely engage in case-specific inquiries when deciding whether to exercise jurisdiction over declaratory judgment actions such as this one. Cincinatti Ins. Co., 2017 WL 4918594, at *4. To guide district courts in their decision-making, the Sixth Circuit has articulated five factors for consideration:
(1) whether the declaratory action would settle the controversy;
(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations at issue;
(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata ";
(4) whether the use of a declaratory judgment action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and
(5) whether there is an alternative remedy that is better or more effective.
Grand Trunk v. W. R.R. Co. v. Consol. Rail Corp., 746 F.2d 323, 326 (6th Cir. 1984).
III. Discussion
Defendants ask the Court to decline to exercise its discretionary jurisdiction over this action. Specifically, they argue that, pursuant to the five factors of consideration articulated by the Sixth Circuit in Grand Trunk, an exercise of jurisdiction would be inappropriate because Tennessee law governs the underlying tort dispute and this declaratory judgment action would not resolve the legal issues and legal relations of the parties in the tort case.
*853 Defendants further contend that exercise of the Court's discretionary declaratory jurisdiction would unnecessarily cause friction between federal and state courts and that Tennessee law provides an adequate and more appropriate remedy for the resolution of insurance coverage disputes.
A. Whether the Declaratory Action Will Settle the Controversy
As Judge Aleta Trauger, of this District, has recently explained, the Sixth Circuit has wavered on how to treat this factor in insurance cases. In Scottsdale Ins. Co. v. Flowers, 513 F.3d 546 (6th Cir. 2008) (hereinafter " Scottsdale"), the Court of Appeals addressed its divergent approaches:
Two lines of precedent seem to have developed in our jurisprudence regarding consideration of this first factor in the context of an insurance company's suit to determine its policy liability.... The difference between these lines of cases appears to rest on the competing policy considerations of consolidating litigation into one court versus permitting a party to determine its legal obligations as quickly as possible.
Cincinatti Ins. Co., 2017 WL 4918594, at * 4 (citing Scottsdale, 513 F.3d at 555 (internal citations omitted) ). The Scottsdale court noted that factual considerations also helped to explain the different lines of cases and concluded, on review, that the district court had adequately resolved all controversies between the parties "because the only controversy between them regarded the scope of the insurance policy." Scottsdale, 513 F.3d at 555. The Court joins Judge Trauger in finding that approach persuasive. "Although there are relevant factual distinctions between the instant case and Scottsdale- for example, the plaintiff insurance company in that case was not a party to the state court action, unlike [Security National] - they do not render th[e C]ourt unable to resolve the issue of what coverage, if any, [Security National] owes to [Defendants] under the [Security Policy]." Cincinatti Ins. Co., 2017 WL 4918594, at *4. As in Scottsdale and Cincinatti Ins. Co., the coverage issue is the only live issue between Security National and the Defendants.
The Court also concurs with policy considerations highlighted by Judge Trauger. While not required to do so by the Security Policy (Doc. No. 1-1 at 26), Security National offered to defend Defendants in the Clark Lawsuit and file a declaratory judgment action. This is a logical course of action, and one that is contemplated by the Security Policy (Doc. No. 1-1 at 26), because Security National could be involved in the handling of Defendants' tort claims in the Clark Lawsuit to protect Security National's interests in the event it was ultimately found to have coverage obligations. However, Defendants went the route of filing a third-party complaint against Security National. As Judge Trauger observed, however, the Tennessee state court is highly likely to focus on the liability disputes between the parties before turning to the question of insurance coverage. Cincinatti Ins. Co., 2017 WL 4918594, at *4. This could substantially - and unnecessarily - prolong Security National's involvement in the Clark Lawsuit. This could be spared by a more expeditious ruling from the Court.
As in Cincinatti Insurance Company, this case is distinguishable from Bituminous Cas. Corp. v. J & L Lumber Co., Inc. and other cases involving "fact-based, and [ ] very close, question[s] of state law." 373 F.3d at 813. District courts are better situated to settle controversies between the parties when "the issue involved [is] a legal, not a factual dispute, and thus, [does] not require the district court to *854 inquire into matters being developed through state court discovery." Scottsdale, 513 F.3d at 557. Here, there are no extensive or difficult fact-based disputes before the Court. In Tennessee, "the obligation of a liability insurance company to defend an action brought against the insured by a third party is to be determined solely by the allegations in the complaint in that action."[2] Gen. Agents Ins. Co. of Am. v. Mandrill Corp., Inc., 243 F. App'x 961, 964 (6th Cir. 2007) (citing Saint Paul Fire and Marine Ins. Co. v. Torpoco, 879 S.W.2d 831, 835 (Tenn. 1994) ). This so-called "pleadings test" does not depend on the actual facts on which the claimants base their claim, but only the allegations in the pleadings - i.e., "the facts as alleged rather than on the facts as they actually are." St. Paul Fire, 879 S.W.2d at 835 (emphasis in original). An insurer must defend its insured in an action "unless it is plain from the face of the complaint that the allegations fail to state facts that bring the case within or potentially within the policy's coverage." Drexel Chem. Co. v. Bituminous Ins. Co., 933 S.W.2d 471, 480 (Tenn. Ct. App. 1996).
Here, the Clark Lawsuit has been filed and the complaint in that action is of record. The questions before the Court involve the allegations of that action and alleged facts relevant to the Security Policy. The question that the Court faces is whether Security National could owe coverage to Defendants under the Security Policy based on the allegations of the Clark's complaint. More specifically, that question is whether the Clarks allege a Lending Wrongful Act, and whether that Lending Wrongful Act falls under an Exclusion to the Security Policy. As presented, the issues to be resolved in this action are neither novel nor complex.
While declaratory relief from the Court will not settle the ultimate controversy between all of the parties in the state court action, it would dispose of the only dispute between Security National and Defendants without affecting the substance of the controversy in the state court tort action. Moreover, a ruling here could prevent unnecessary expense and effort on behalf of Security National in potentially drawn-out state court litigation, and there is no substantial risk of conflicting factual determinations between this court and the Tennessee state court. Cincinatti Ins. Co., 2017 WL 4918594, at *5. The Court therefore concludes that the first factor weighs in favor of exercising jurisdiction. See e.g., Scottsdale, 513 F.3d at 556 (holding that the declaratory judgment settled the controversy *855 between the parties because "the only issue addressed by the district court was whether Scottsdale's insurance policy for the Morton Center covered Flowers as an insured."); Northland Ins. Co. v. Stewart Title Guar. Co., 327 F.3d 448, 454 (6th Cir. 2003) (finding that, "while the declaratory judgment would not end the dispute between Cailu and Stewart, it would settle the controversy regarding the scope of insurance coverage issued by Northland to Cailu, and whether Northland had a duty to defend the insureds," and noting that "[i]f Northland in fact had no duty to indemnify its insured or to defend them in the state action, then it should not be forced to participate in that action"); Cincinatti Ins. Co., 2017 WL 4918594, at *5 (concluding same); Nautilus Ins. Co. v. Tenort, No. 14-cv-2055-SHL-tmp, 2015 WL 11019254, at *3 (W.D. Tenn. Apr. 20, 2015) ("A judgment on this matter would settle the controversy, at least as it pertains to the representation and indemnification issues between the insured and the insurer in the underlying state court issue."); Amer. W. Home Ins. Co. v. Lovedy, No. 4:06-cv-8, 2006 WL 3740874, at *3 (E.D. Tenn. Dec. 15, 2006) ("Although this declaratory judgment action will not resolve the underlying litigation, it will further the underlying litigation by clarifying Plaintiff's obligations to [the insured] in the underlying litigation."); Maryland Cas. Co. v. Faulkner, 126 F.2d 175, 178 (6th Cir. 1942) ("A declaratory judgment proceeding which involves only the extent of the coverage of an insurance policy, and not the liability of the insured to the person injured in the accident, will be entertained in the Federal Court, and the insurer is entitled to have the extent of the coverage of its policy declared in such proceeding, other essentials of jurisdiction being present.").
B. Whether the Declaratory Judgment Action Will Clarify the Legal Relations Between the Parties
This factor is closely related to, and often considered in conjunction with, the first factor. See Travelers Indem. Co., 495 F.3d at 271. "[I]t is almost always the case that if a declaratory judgment will settle the controversy, then it will clarify the legal relations in issue." Scottsdale, 513 F.3d at 557. More specifically, "a prompt declaration of policy coverage would surely 'serve a useful purpose in clarifying the legal relations at issue.' " Roumph, 211 F.3d at 968. Indeed, a "grant of declaratory relief in insurance coverage cases undoubtedly settles the controversy over the insurer's liability to provide a defense for and/or indemnify its insured, thus clarifying the legal relations in issue." Green, 825 F.2d at 1066. In Scottsdale, the Court of Appeals clarified how this factor should be analyzed in insurance cases, finding that a district court should focus on the legal issue of indemnity in determining whether it can clarify legal relations between the parties:
The requirement that the judgment clarify the legal relationships of the parties is based upon our desire for the declaratory judgment to provide a final resolution of the discrete dispute presented. While the parties may have other tortious or contractual relationships to clarify in state court, our concern in considering the second Grand Trunk factor in such cases is with the ability of the federal declaratory judgment to resolve, once and finally, the question of the insurance indemnity obligation of the insurer. Thus, we focus only on whether a federal declaratory judgment will clarify the legal relationships presented to the district court.
Id. (emphasis added). Accordingly, the Court focuses not on whether it is situated *856 to clarify the relationships of all the parties to the Clark Lawsuit (as Defendants argue), but on whether it would be able to clarify the insurer-insured coverage dispute between Security National and Defendants. After doing so, the Court concludes that it is well-situated to determine the issue of Security National's coverage obligations under the Security Policy and can therefore clarify the legal relations between Security National and Defendants as dictated by Scottsdale.[3] Thus, the second factor weighs in favor of exercising jurisdiction. See Cincinatti Ins. Co., 2017 WL 4918594, at *5 (concluding same); Nautilus Ins. Co., 2015 WL 11019254, at *3 (concluding same); Roumph, 211 F.3d at 968 (observing that a prompt declaration of policy coverage would surely "serve a useful purpose in clarifying the legal relations at issue").
C. Is the Declaratory Remedy Being Used Merely to "Provide An Arena for Res Judicata "?
Defendants argue that frowned-upon "procedural fencing" exists because Security National chose to have the issue of its liability determined in federal court in advance of a state court determination of the issue. In short, Defendants contend that Security National was aware that they were going to file a third-party complaint in the Clark Lawsuit and "jump filed" this action in federal court in a race for res judicata. In response, Security National contends that, under threat of lawsuit, it acted according to its regular course of business to file this action in federal court, as the most appropriate forum, to seek declaratory relief.
This third factor is meant to resist jurisdiction for "declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a 'natural plaintiff' and who seem to have done so for the purpose of acquiring a favorable forum." AmSouth Bank v. Dale, 386 F.3d 763, 788 (6th Cir. 2004). "The question is ... whether the declaratory plaintiff has filed in an attempt to get her choice of forum by filing first." Id. at 789. The Court of Appeals has stated that courts should be "reluctant to impute an improper motive to a plaintiff where there is no evidence of such in the record." Scottsdale, 513 F.3d at 558 ; see also Travelers, 495 F.3d at 272 ; Allstate Ins. Co. v. Mercier, 913 F.2d 273, 279 (6th Cir. 1990). Furthermore, when the plaintiff has filed his claim after the state court litigation has begun, we have generally given the plaintiff "the benefit of the doubt that no improper motive fueled the filing of [the] action." Scottsdale, 513 F.3d at 558 (quoting *857 Bituminous, 373 F.3d at 814 ); see also Northland Ins. Co., 327 F.3d at 454 (finding no improper motive when the facts demonstrated that plaintiff filed its action only after it became apparent that its insureds had no colorable claim to coverage). Put simply, "[a] district court should not deny jurisdiction to a plaintiff who has not "done any more than choose the jurisdiction of federal rather than state court, a choice given by Congress." Scottsdale, 513 F.3d at 558 (quoting State Farm Fire and Cas. Co. v. Odom, 799 F.2d 247, 250 n.1 (6th Cir. 1986) ).
Here, the Court does not find sufficient evidence of record that the filing of Security National's declaratory judgment action was motivated by procedural fencing or a race for res judicata . After Defendants oddly rejected Security National's offer to provide Defendants a defense subject to a reservation of rights, Security National had two choices: bring this declaratory judgment action or file the same action in state court. Security National instituted this action five months after the state court proceedings began and before defendants filed a third-party complaint in the state court action that would have implicated Security National's coverage obligations. "While this action may have been an attempt to preempt an issue that the state court would eventually consider, the Declaratory Judgment Act gives [Security National] the right to do precisely that, especially when the state court litigation has been ongoing without resolving the issue." Id. at 559. Accordingly, absent some indication of an improper motive in the record,[4] this third factor does not point toward denying jurisdiction.
D. Friction Between Federal and State Courts
The Supreme Court has cautioned that "where another suit involving the same parties and presenting opportunity for ventilation of the same state law issues is pending in state court, a district court might be indulging in '[g]ratuitous interference,' if it permitted the federal declaratory action to proceed." Wilton, 515 U.S. at 283, 115 S.Ct. 2137 (quoting Brillhart, 316 U.S. at 495, 62 S.Ct. 1173 ). However, "the mere existence of a state court proceeding is not determinative of improper federal encroachment upon state jurisdiction." Green, 825 F.2d at 1067. Thus, to determine whether the exercise of jurisdiction would increase friction between federal and state courts, the Sixth Circuit directs the Court to consider three sub-factors:
(1) whether the underlying factual issues are important to an informed resolution of the case;
(2) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and
(3) whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.
Bituminous, 373 F.3d at 814-15 (citing Scottsdale, 211 F.3d at 968 ) (formatting altered). With regard to the first factor, in the context of actions seeking a declaration of the scope of insurance coverage, the Sixth Circuit has recognized that such *858 questions can sometimes be resolved as a matter of law and do not require factual findings by a state court. Scottsdale, 513 F.3d at 560 ; Green, 825 F.2d at 1067. The second sub-factor focuses on which court, federal or state, is in a better position to resolve the issues in the declaratory action. The Sixth Circuit "generally consider[s] state courts to be in a better position to evaluate novel questions of state law." Scottsdale, 513 F.3d at 560 (emphasis added); see also, e.g., Travelers, 495 F.3d at 272 (finding Kentucky courts were in a better position to interpret unresolved question of Kentucky negligence law necessary for determination of scope of coverage); Bituminous, 373 F.3d at 815-16 ("Where, as here, there are two potential unresolved questions of state law ... this consideration weighs against exercising jurisdiction."); Omaha Prop. and Cas. Ins. Co. v. Johnson, 923 F.2d 446, 448 (6th Cir. 1991) (looking unfavorably upon federal courts "preempting the right of the state court to rule on a previously undetermined question of state law"). This consideration has less force, however, when the relevant state law is more straightforward. Scottsdale, 513 F.3d at 560. The final sub-factor focuses on whether the issue in the federal action implicates important state policies and is, thus, more appropriately considered in state court. Id. at 561. The Court of Appeals has found that issues of insurance contract interpretation are questions of state law with which state courts are more familiar and well-suited to resolve, Travelers, 495 F.3d at 273 and Bituminous, 373 F.3d at 815, but has also recognized that not all issues of insurance contract interpretation implicate such fundamental state policies that it is not appropriate for federal courts to consider them, Scottsdale, 513 F.3d at 561.
As discussed above, Security National's obligation to the Defendants in an action brought by the Clarks will be determined by the complaint in that underlying action, not any debated facts surrounding the liability of the other parties thereto. This action therefore does not implicate the resolution of extensive factual issues because the complaint in the Clark Lawsuit speaks for itself. The interpretation of the Security Policy is not a complicated exercise. Finally, neither party has argued that this coverage dispute involves any novel or unsettled questions of state law.[5] In this way, this case is distinguishable, for example, from Travelers, relied upon by Defendants. There, the question of the scope of coverage turned upon "whether any negligence on the part of [the hospital] in allowing [the patient] to leave the facility and drive his car was part of its medical treatment of [the patient], and [wa]s therefore 'medical' negligence, or whether such action was a separate act of ordinary negligence." Travelers, 495 F.3d at 272. The Court of Appeals acknowledged that this was an open question under Kentucky law and deferred to the Kentucky court. Id. Here, there is no obvious need for a Tennessee court reading of an "open question" (e.g., the "pleadings test" discussed above is not currently in question), and it appears that the Court will be able to accurately predict how a Tennessee court would resolve the issues.
Regarding the third sub-factor, as Judge Trauger logically reasoned, "this *859 presumption triggers only when state courts are applying the public policies that inhere in their own state's laws." Cincinatti Ins. Co., 2017 WL 4918594, at *6. However, the Court is mindful that the Court of Appeals has quite consistently leaned toward the view that "interpretation of ... insurance contracts is guided by state public policy," and concluded that state courts are in a somewhat better position to resolve insurance disputes. See, e.g., Scottsdale, 513 F.3d at 561. However, given the finding that only one of the three sub-factors counsels in favor of yielding to the state courts, the Court concludes that the fourth Grand Trunk factor does not clearly require declining jurisdiction.
E. Whether There is an Alternative Remedy That is Better or More Effective
In just a few sentences, Defendants suggest that the Clark Lawsuit is a better remedy because Security National has been made a party to that case. Security National responds that the Clark Lawsuit is no better and potentially a worse because it will require Security National to "sit by and ... wait." (Doc. No. 18 at 12-13.) Indeed, a district court should only "deny declaratory relief if an alternative remedy is better or more effective ." Grand Trunk, 746 F.2d at 326 (emphasis added). That being said, the Sixth Circuit also avoids a rigid application of this factor. "[I]nquiry [ ] must be fact specific, involving consideration of the whole package of options available to the federal declaratory plaintiff." Scottsdale, 513 F.3d at 562.
The court sees no alternative remedy that presents a notably more attractive option. As discussed above, the Tennessee court is no better situated than this court to resolve the questions at issue. Just as important are concerns that Security National "could be dragged along for a long and expensive ride before the issue of its coverage obligations is determined in the state court litigation."[6] Cincinatti Ins. Co., 2017 WL 4918594, at *7 ; see also Green, 825 F.2d at 1067 ("[W]e are not convinced that an action for indemnity, instituted only after the insurance company has provided a defense which it may not have been obligated to render, is in every case a 'superior remedy.' "). Because Security National has no clearly superior options to this action, the court finds that the fifth Grand Trunk factor is at least neutral and at most supports the Court's exercise of jurisdiction.
F. Balancing the Factors
The Sixth Circuit has "never indicated how the Grand Trunk factors should be balanced." Scottsdale, 513 F.3d at 563. Nonetheless, having found the relevant factors favor exercising jurisdiction in varying degrees, the Court's balancing of the factors in this case leans in favor of exercising jurisdiction. The Court concludes that federal adjudication of Security National's declaratory judgment action is, on balance, appropriate.[7]
*860 IV. Conclusion
In the Court's discretion, and for the foregoing reasons, Defendant's Motion to Dismiss (Doc. No. 12) will be denied. This case will be returned to the Magistrate Judge for further case management, including, if appropriate, accelerated dispositive motion scheduling.
An appropriate order will enter.

Security National also declined coverage on several other grounds (see Doc. No. 1-3 at 4-6) but, as this is sufficient for purposes of the instant motion, the Court need not go further.

Federal courts have recognized that, under Tennessee law, unless an insurance policy contains an enforceable choice of law clause the substantive law of the state where an insurance policy was issued and delivered will control. Nelson v. Nelson, 409 S.W.3d 629, 632 (Tenn. 2013) (citing Stakem v. Randolph, 431 F.Supp.2d 782 (E.D. Tenn. 2006) ); Shupe v. Simcox, No. 1:09-CV-138, 2009 WL 3152810 (E.D. Tenn. Sep. 28, 2009) ; NGK Metals Corp. v. Nat'l Union Fire Ins. Co., No. 1:04-CV-56, 2005 WL 1115925 (E.D. Tenn. Apr. 29, 2005). The Security Policy demonstrates an understanding by the parties that the principal location of the insured risk was Tennessee. The named insured on the Policies are Defendants, who were located in Tennessee. The declarations page includes the Tennessee address of Jamestown Union. There is a page of Tennessee-specific changes to Security National's standard policy. Union Bank, which is located in Tennessee, is the only entity listed on the Schedule of Subsidiaries. Taken together, the circumstances of the contractual arrangement between Security National and Defendants' business evince a "view to" Tennessee. The Court therefore assumes, arguendo , that Tennessee law governs the Security Policy. See Cincinatti Ins. Co., 2017 WL 4918594, at *7 (engaging in same analysis). The parties have not asserted that the law of any other jurisdiction controls here.

Defendants also assert, with little authority, that the Clarks are indispensable parties to this action under Federal Rule of Civil Procedure 19. The Court does not agree. In relevant part, Rule 19 states:
A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
(A) in that person's absence, the court cannot accord complete relief among existing parties; or
(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
(i) as a practical matter impair or impede the person's ability to protect the interest; or
(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.
Here, the Clarks have no rights against Security National and are not a party to the Security Policy; the Court can afford complete relief without them. Moreover, the Clark's interest - i.e., their ability to hold Defendants liable in tort - exists irrespective of the coverage determination.

Defendants have included a "timeline" of pre-filing communications between the parties in the motion to dismiss that is meant to establish an improper motive. (Doc. No. 13 at 11.) The underlying communications are not of record, however. Regardless, the Court does not find them sufficient to alter its conclusion.

Defendants contend extensive discovery will be necessary in the evidence development phase of this declaratory judgment action. The Court does not agree. As discussed herein, the issue before the Court is primarily a legal one that will be resolved by consulting the Security Policy, the complaint in the Clark Lawsuit, and relevant law. While some discovery might be necessary, broad concerns regarding neverending fact discovery are unpersuasive.

This is not an empty concern because Security National has offered to defend Defendants in the Clark Lawsuit despite the strong belief that the Clark Lawsuit does not implicate coverage under the Security Policy. (Doc. No. 18 at 12-13.) Thus, a wait-and-see approach in state court is certainly not more desirable from Security National's vantage point.

Defendants do not argue for a stay in the event the Court were to deny the motion to dismiss. See Cincinatti Ins. Co., 2017 WL 4918594, at *3 (noting that courts may enter a stay of the federal proceeding in lieu of dismissal until resolution of the state court proceeding); Wilton, 515 U.S. at 282-83, 115 S.Ct. 2137 (discussing factors relevant to a stay as an alternative). Accordingly, the Court does not consider that possibility. See Adams v. Prunick, No. 2:08-cv-156, 2009 WL 3074366, at *1 (W.D. Mich. Sept. 23, 2009) ("It the role of the attorneys to make the arguments before the Court and it is the role of the Court to make decisions based upon those arguments.").